SKC

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Jennifer Hardin, et al.,

　　　　　Plaintiffs,

v.

Yavapai County, et al.,

　　　　　Defendants.

No.　CV-23-08001-PCT-DWL (JZB)

**ORDER**

This action arises from the death of Jacob Shaver ("Jacob") while in custody at the Yavapai County Jail. Plaintiffs are Jennifer Hardin and Lee Shaver, Jacob's biological mother and father, and Tamara Valle, guardian ad litem of A.S., Jacob's minor child. The two remaining Defendants are Wexford Health Services, Inc. ("Wexford") and Wexford Nurse Brandi Buck ("Nurse Buck") (together, "Defendants"),[1] against whom Plaintiffs have asserted claims under 42 U.S.C. § 1983 as well as state-law claims for medical negligence and wrongful death. (Doc. 48.)

Now pending before the Court is Defendants' motion for summary judgment. (Doc. 93.) After the motion become fully briefed (Docs. 106, 112), the Court solicited and received supplemental briefing on the issue of causation (Docs. 121, 122).

For the reasons that follow, the summary judgment motion is granted. Based on this outcome, Defendants' motion to exclude the opinions of Debby Weissman, R.N. (Doc.

---

[1]　Plaintiffs also asserted claims against Yavapai County and several additional Yavapai County or Wexford employees, but the parties have stipulated to the dismissal of those Defendants. (Docs. 53, 72, 105.)

89) and motion to strike rebuttal report of Mario San Bartolome, M.D. (Doc. 90) are denied as moot.

**I.      Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

…

## II.    Facts

### A.    Jacob's Arrest and Detention

On March 9, 2021, Jacob was arrested for drug possession during a traffic stop in Cottonwood, Arizona, and he was subsequently booked into the Yavapai County Jail. (Doc. 120, Defs.' Amended Statement of Facts ("DSOF") ¶ 1.)

During his medical intake screening on the morning of March 10, 2021, Jacob reported using fentanyl (15 pills a day), methamphetamine, and heroin (2 grams a day), with frequency of drug use "every day all day," and his last reported drug use "2 hours ago." (*Id.* ¶ 2.) He also reported the following medical problems: skin rash, eczema, and asthma. (*Id.*) He was placed in the jail infirmary for opioid detox observation. (*Id.* ¶ 3.)

Jacob's medical chart notes show that at 10:37 a.m. that same morning, Dr. Leon Cattolico noted that Jacob was coughing, had shortness of breath, and was congested. (Doc. 110 at 25.) Dr. Cattolico prescribed Amoxicillin 500 mg twice daily for 10 days, Guaifenesin 200 mg twice daily as needed, Ibuprofen 200 mg twice daily as needed, Loratadine 10 mg once daily as needed, and Xopenex HFA (levalbuterol) 45 mcg 2 puffs twice daily as needed. (DSOF ¶ 5; Doc. 120 at 32.)

### B.    Jacob's COWS Assessments

#### 1.    March 10, 2021

At 11:15 a.m. on March 10, 2021, a jail nurse assessed Jacob's condition using the Clinical Opioid Withdrawal Scale ("COWS"). (DSOF ¶ 4; Doc. 119 at 4.) The purpose of COWS is to monitor a patient's condition during opioid withdrawal, including by noting such things as whether they are eating or drinking and if they have behavioral health issues, high anxiety, or high blood pressure. (Doc. 107 at 77, Pl.'s Statement of Facts ("PSOF") ¶¶ 6-7.) The COWS assessment form tracks the patient's vital signs as well as the following eleven detox-relevant indicators: resting pulse rate, sweating, restlessness, pupil size, bone or joint pain, runny nose/tearing, GI upset, tremor, yawning, anxiety/irritability, and gooseflesh skin. (Doc. 119 at 4.)

During Jacob's initial COWS assessment at 11:15 a.m. on March 10, 2021, the nurse noted the following vitals: Temp, 98.3; Pulse, 98; Resp, 16; O2, 94; BP, 133/79. (DSOF ¶ 4; Doc. 119 at 4.). The nurse scored Jacob's resting pulse rate as 1 (which equates to a range of 81-100); his bone or joint pain as 1 (with equates to "mild diffuse"); his runny nose/tearing as 1 (with equates to "stuffiness/moist eyes"); and his GI upset as 1 (with equates to "stomach cramps"), with the remaining fields rated zero, for a total COWS score of 4. (Doc. 119 at 4.) Based on the COWS form scoring guide, total scores of 1-12 indicate mild withdrawal; 13-24 indicate moderate withdrawal; 25-36 indicate moderately severe withdrawal; and > 36 indicate severe withdrawal. (*Id.*) Thus, Jacob's total COWS score of 4 equated to mild withdrawal. (*Id.*)

At 8:00 p.m. on March 10, 2021, a nurse performed a second COWS assessment on Jacob and noted the following vitals: Temp, 96.8; Pulse, 106; Resp, 16; O2, 95; BP, 147/96. (*Id.*) The nurse scored Jacob's resting pulse rate as 2 (with equates to a range of 101-120); his restlessness as 3 (with equates to "frequent shifting"), and his anxiety/irritability as 3 (with equates to "so anxious exam difficult"), with the remaining fields marked zero, for a total COWS score of 8 (mild withdrawal). (*Id.*)

### 2.     March 11, 2021

At 11:00 a.m. on March 11, 2021, Nurse Buck saw Jacob for the first time. (DSOF ¶ 25 ["Nurse Buck's first interaction with Shaver was March 11, 2021, when she completed his [COWS] assessment."]; Doc. 119 at 4 [indicating that the first COWS assessment that day occurred at 11:00 a.m.].) Nurse Buck became a registered nurse in 2010/2011 after graduating from Yavapai Community College, and she worked at Haven Health before being hired by Wexford in 2012/2013. (DSOF ¶¶ 22-23.)

When she saw Jacob on March 11, 2021, Nurse Buck was aware that Jacob was on detox protocol. (PSOF ¶ 5.) She performed a COWS assessment and noted the following vitals: Temp, 98.7; Pulse, 113; Resp, 16; O2, 96; BP, 124/78. (Doc. 119 at 4.) She scored Jacob's resting pulse rate as 2 (which equates to a range of 101-120) and his GI upset as 2

(which equates to "nausea/loose stools"), with the remaining fields scored zero, for a total COWS score of 4 (mild withdrawal).  (*Id.*)

During her deposition, Nurse Buck testified that respiration of 16 breaths per minute is not out of the ordinary.  (Doc. 120 at 105, Buck Dep. at 38:1-9.)  She further testified that Jacob's rescue inhaler was then being kept by medical.  (Doc. 120 at 105, Buck Dep. at 38:14-20.)  She also explained that Jacob's resting pulse, which she scored 2, was moderate and did not cause her concern, and his GI upset of 2 meant Jacob had nausea but had not thrown up because, if he had thrown up, she would have scored his GI upset 3.  (Doc. 120 at 105, Buck Dep. at 38:21-39:24, 40:1-16.)

Based on his nausea, Nurse Buck placed Jacob on a full liquid diet and instructed him to drink more fluids.  (DSOF ¶ 7; PSOF ¶ 18.)  She explained during her deposition that when she knows a detainee is not eating due to nausea, she asks if he wants a full liquid diet, and if he does, she "put[s] him on a full liquid diet, stating he cannot eat."  (Doc. 108 at 31, Buck Dep. at 71:1-9.)  Nurse Buck's chart notes for Jacob at 11:57 a.m. state: "IM [inmate] continues in infirmary on OOBS [opioid observation], COWS 4, FL diet placed for stated Nausea and cannot eat.  No other issues stated.  IM pulse elevated and IM told his water to sink is on, drink more water."  (Doc. 110 at 25.)

At 8:00 p.m. on March 11, 2021, a nurse performed a fourth COWS assessment on Jacob and noted the following vitals: Temp, 97.9; Pulse, 80; Resp, 16; O2, 97; BP, 138/90.  (DSOF ¶ 8.)  The nurse scored Jacob's resting pulse rate as 1 (which equates to a range of 81-100); his restlessness as 3 (which equates to "frequent shifting"); his runny nose/tearing as 2 (which equates to "nose running"); his GI upset as 3 (which equates to "vomiting/diarrhea"), and his anxiety/irritability as 1 (which equates to "reports having"), with the remaining fields scored zero, for a total COWS score of 10 (mild withdrawal).  (Doc. 119 at 4.)  Nurse Arbuckle's chart notes for Jacob at 9:42 p.m. state: "Infirmary for Opiate Detox Obs, COWS=10.  IM had a large amount of yellow emesis [vomit] in trash can when vs. taken (sic), had shower and change of clothes.  On antibiotics po with no SOB [shortness of breath], alert.  Non productive occasional cough."  (Doc. 110 at 25.)

### 3.    March 12, 2021

At 8:30 a.m. on March 12, 2021, Nurse Buck performed a fifth COWS assessment on Jacob and noted the following vitals: Temp, 98.1; Pulse, 124; Resp , 16; O2, 98; BP, 125/90.  (DSOF ¶ 9; Doc. 119 at 4.).  She scored Jacob's resting pulse rate as 4 (which equates to over 120); his restlessness as 2 (which is between (1) "reports difficult to sit" and (3) "frequent shifting"); his GI upset as 3 (which equates to "vomiting/diarrhea"); and his anxiety or irritability as 1 (which equates to "reports having"), with the remaining fields scored zero, for a total COWS score of 10 (mild withdrawal).  (Doc. 119 at 4.)

At 10:29 a.m. that same day, Nurse Buck ordered, and Dr. Cattolico approved/prescribed, Antacid, 30 cc's twice daily as needed through March 14, 2021, and Promethazine (Phenergan), 25 mg one tablet twice daily as needed through March 16, 2021.  (DSOF ¶ 10; Doc. 120 at 36-37.)  Nurse Buck's chart notes for Jacob at 12:03 p.m. the same day state: "IM continues in Infirmary on OOBS COWS 10 for vomitus and elevated pulse.  IM drank full bottle of Gatorade with no vomitus.  IM dark circles under eyes, not eating or drinking due to detox stated.  VS [vital signs] charted and well." (Doc. 110 at 25.)

At an unclear time on March 12, 2021,[2] Nurse Arbuckle performed another COWS assessment (the sixth to date) on Jacob and noted the following vitals: Temp, 98.3; Pulse, 121; Resp , 16; O2, 95; BP, 147/87.  (DSOF ¶ 11.)  She scored Jacob's resting pulse rate as 2 (which equates to a range of 101-120); his restlessness as 2 (which is between (1) "reports difficult to sit" and (3) "frequent shifting"); his GI upset as 2 (which equates to "nausea/loose stools"); and his anxiety or irritability as 2 (which equates to "obviously anxious"), with the remaining fields scored zero, for a total COWS score of 8 (mild withdrawal).  (Doc. 119 at 4.)  Nurse Arbuckle's chart notes for Jacob at 11:13 p.m. that same day state: "Infirmary for Opiate Detox Obs, COWS=8, nausea, restlessness, stated he

---

[2]    Although this is the second COWS assessment listed for March 12, 2021, the time entry appears to say "983" (Doc. 119 at 4), making it unclear when the assessment took place.

did not eat today because he was not hungry and did not want anything.  Had water off med cart." (Doc. 110 at 25.)

### 4.    March 13, 2021

On March 13, 2021 at 6:30 a.m., Nurse Buck performed a seventh COWS assessment on Jacob and noted the following vitals: Temp, 96.6; Pulse, 111; Resp, 16; O2, 98; BP, 132/64. (DSOF ¶ 12.).  She scored Jacob's resting pulse rate as 2 (which equates to a range of 81-100) and his GI upset as 3 (which equates to "vomiting/diarrhea"), with the remaining fields scored zero, for a total COWS score of 5 (mild withdrawal). (Doc. 119 at 4.)  Nurse Buck's chart notes for Jacob at 8:35 a.m. that same day state:

> IM laying on cot 06:15 STATING HE can't get up.  IM was told by TW [this writer] to get up and come out for VS now.  IM rose, VS obtained, and IM [was] asked to put his shoes on and come out for a walk.  IM has been laying curled up for 2 days, not moving, drinking fluid and vomiting and pouring it into a trash can.  IM told to clean up his mess.  IM drank small amount of [G]atorade and walked hall.  IM did not vomit.  IM [was] told to get up and walk in cell, move around stop laying down with drinking his FL diet.  IM layed down anyways curled up in fetal form.

(Doc. 110 at 25.)

Nurse Buck made two additional chart entries for Jacob that morning.  (*Id.*)  At 8:39 a.m., she wrote:

> [At] 07:40 IM pulled from cell and given promethazine prior to med pass.  07:50 no vomitus.  IM [was] asked to get up and come out for Med pass.  IM would not respond, again IM [was] told to get up, other IMs began to yell at IM.  They were asked to stop.  IM got up, came out for Med Pass.  Med pass taken and IM [was] asked to stand up against the wall for the meds and fluid to settle, not to lay down.  IM stated nowhere to stand, boat (sic) was kicked away from wall and 1/2 full trash can of fluid spilled across entire floor under other IM cots.  IMs pulled from cell, and This IM [w]as told to clean up with mop and bucket.  IM able to clean up cell without vomitus, trash can will NOT be placed by IM bed again.  IM can get up and go to the sink or toilet if he feels like vomitus as IM is not helping self or clean up after self, and trash can being used is accumulating and he is not taking care of it.  IM told to start getting up.  IM will be walked in hall again per DO to get him up and moving.

(*Id.*)

At 10:47 a.m., Nurse Buck wrote:

IM continues in Infirmary DAY-4 of DETOX OOBS.  IM moved down to holding due to behaviors.  IM sitting on toilet asking for toilet paper.  NO evidence of vomitus since early this a.m., will continue to monitor.  COWS 5 with Gatorade given drank with promethazine this [a.m.] and has exhibited no vomitus since.  Lunch being served will continue to monitor.

(*Id.* at 25-26.)

When asked about these entries during her deposition, Nurse Buck stated that "most inmates . . . don't feel like getting up and showering or brushing their teeth or cleaning their vomit," but detention officers and nursing staff expect them to take care of their personal hygiene and clean up their own messes.  (Doc. 120 at 112, Buck Dep. at 86:2-25.)  She said that, medically speaking, if a detoxing inmate is on a full liquid diet and is not moving around, he will be prone to nausea, so every inmate is told after drinking to get up and walk around to let the liquid digest.  (Doc. 120 at 112, Buck Dep. At 88:22-89:12.)  She stated that it is typical for detoxing inmates to not want to get up and instead "just go back and get in bed, cover their head with a blanket or their eyes and try to ignore you," and she believed Jacob was exhibiting these tendencies as opposed to being physically unable to get up and move around.  (Doc. 120 at 113, Buck Dep. at 90:16-24, 93:14-19.)  She also stated that if an inmate is physically incapable of getting up, "then that's another issue," which "would require them being helped into a chair, get their full vitals, call a physician."  (Doc. 120 at 112, Buck Dep. at 89:13-21.)

Nurse Buck did not call the doctor for Jacob on March 13, 2021.  (Doc. 120 at 107, Buck Dep. at 57:14-23.)  She testified during her deposition that this was because Jacob had been detoxing for three or four days, his protocol detox medications were already in place, and based on his 6:30 a.m. vitals, "there had not been any type of decline where I would have called the physician to ask for additional orders."  (Doc. 120 at 107-08, Buck Dep. at 57:14-58:8.)

…

…

- 8 -

### C.    Jacob's Death

On March 13, 2021, at approximately 11:25 a.m., Detention Officer ("DO") Klein observed Jacob having trouble breathing, and he went to the nurses' station and alerted Nurse Buck. (DSOF ¶ 13; PSOF ¶¶ 52−55.) Nurse Buck got Jacob's inhaler and walked with DO Klein to Jacob's cell. (PSOF ¶ 57.) Nurse Buck asked DO Klein to have Jacob come out of his cell and sit on a bench. (DSOF ¶ 14; PSOF ¶ 59.) While seated on the bench, Jacob hunched over with his head down and started vomiting through his mouth and nostrils, and he vomited copious amounts of brown liquid. (DSOF ¶ 15; PSOF ¶¶ 60-61.) After vomiting, Jacob became unresponsive, and at approximately 11:30 a.m., a crash cart was called. (DSOF ¶ 15.) DO Klein and another detention officer laid Jacob out on the floor to check his pulse and determine if he needed CPR. (DSOF ¶ 15; PSOF ¶ 63.) When no pulse was felt, CPR was initiated, and Jacob received two AED shocks. (DSOF ¶¶ 15-16.) At 11:34 a.m., Jacob received nasal Narcan, and at 11:36 a.m., he received a Narcan injection in the left deltoid. (*Id.* ¶ 16.) At approximately 11:45 a.m., EMS arrived and took over resuscitation efforts. (*Id.* ¶ 17.) An ET tube was inserted, intraosseous access was established, and Jacob was given multiple doses of epinephrine. (*Id.*) At 12:08 p.m., Jacob was transported to Verde Valley Medical Center with continued CPR and pulseless electrical activity. (*Id.* ¶ 18.) At 1:25 p.m., Jacob was pronounced dead. (*Id.* ¶ 19.)

The Yavapai County Medical Examiner's Autopsy Report lists under "final autopsy diagnoses" "[a]cute complications of chronic drug abuse" based on underlying findings of illicit fentanyl metabolite (4-ANPP) in the blood, and methamphetamine, amphetamine, fentanyl, and norfentanyl in the urine. (DSOF ¶¶ 20-21; Doc. 95-2 at 16.) The medical examiner additionally diagnosed "[e]xacerbation of bronchial asthma." (Doc. 95-2 at 16.) The medical examiner's summary states: "In my opinion, this 26-year-old man died of acute complications of chronic drug abuse. A contributing condition is bronchial asthma exacerbation. The manner of death is natural." (Doc. 95-2 at 17. *See also* Doc. 107 at 5, Pls.'s Controverting Statement of Facts ("PCSOF") ¶ 20; PSOF ¶ 165.)

**D.    Wexford's Policies**[3]

According to Nurse Buck, any jail inmate who has "used any type of illicit substance that needs to be monitored—and it's usually more than one substance—gets a COWS if their main substance is opiates . . . to monitor how they're doing." (Doc. 120 at 103, Buck Dep. at 33:7−11.)  In addition, Wexford requires its nurses to enter chart notes "at least once a day or any time you have a significant event with an inmate." (Doc. 120 at 117, Buck Dep. at 172:22-173:9.)  The purpose of medical charting is to give an overview of what has been going on with an inmate at any given time so that other nurses or colleagues can refer to that information when treating a patient.  (PSOF ¶ 12.)  According to Nurse Buck, "it is not the practice" for nurses to review intake forms for every patient. (Doc. 108 at 13, Buck Dep. at 33:19-22.)  Instead, nurses rely on "the information given at report or at hand, and then if time warrants [they can] review the intake form for information." (Doc. 108 at 13, Buck Dep. at 33:22-24.)  Nurse Buck does not have an independent recollection of reviewing Jacob's intake form and does not recall if she learned Jacob used narcotics from his intake form or from a colleague via a COWS assessment and verbal report, but she said "generally . . . you report off from another nurse, looking at their COWS if they have one [and] a verbal report." (Doc. 108 at 13-14, Buck Dep. at 33:25-34:23.)

Inmates experiencing nausea during detox are given promethazine "prior to med pass or even [before] a meal" to prevent nausea because, according to Nurse Buck, "they usually gulp Gatorade or water with their meds, and if they're prone to nausea, it will come right back up," whereas promethazine helps them "keep their fluids and medications down. (Doc. 120 at 114, Buck Dep. at 94:23−95:7.)  "Med pass" is when nursing staff deliver inmates their prescribed medications.  (Doc. 120 at 114, Buck Dep. at 94:15-18.)

---

[3]    Defendants did not set forth a specific set of facts about Wexford's medical/detox policies in the DSOF and did not provide any written Wexford policies.  The following facts are drawn from Defendants' citations to the deposition testimony of Nurse Buck in the DSOF and Plaintiffs' citations to the deposition testimony of Nurse Buck, Dr. Cattolico, and defense expert RN Daliborka Bruno in the PSOF, to the extent such testimony is based on personal knowledge or supported by documentary evidence.

Nurses can call the doctor or go to the doctor's onsite office whenever they have a concern, and unless it's an emergency that requires calling 9-1-1, they must get the doctor's approval before issuing new orders or sending an inmate out for care. (Doc. 120 at 114, Buck Dep. at 96:13-19.) Wexford also requires nursing staff to "[c]all [the] clinician immediately for any patient suspected of having a severe narcotic withdrawal by either symptoms or through the COWS assessment." (PSOF ¶ 28.) Dr. Cattolico worked at the jail five days a week, Monday through Friday, and he was on call via telephone 24 hours a day, seven days a week. (PSOF ¶ 24.)

### E.　　Follow-up Investigation

After Jacob's death, Yavapai County Detective Sean Chupp was assigned to investigate. (PSOF ¶¶ 120-22.) Detective Chupp interviewed three of Jacob's former cellmates at the jail. (*Id.* ¶ 123.) One of these cellmates, Matthew Crew, told Detective Chupp that Jacob was "detoxing bad," and every time Jacob ate or drank, it would come back up. (*Id.* ¶¶ 128-29.) He said Jacob was getting more lethargic every day and that, over his three days of detox, Jacob would lean up, throw up, and lay back down. (*Id.* ¶¶ 131-33.) Another cellmate, Daniel Sanchez, told Detective Chupp that Jacob was quiet but made weird sounds when he tried to breathe, and he threw up a lot and was trying to gasp for air. (*Id.* ¶¶ 136-41.) Mr. Sanchez also said that Jacob told the nurse that every time he wanted to breathe, it felt like he was being stabbed. (*Id.* ¶ 142; Doc. 114 [video at 5:20-32].) When asked when Jacob said this, Mr. Sanchez said, "today," meaning on March 13, 2021. (Doc. 114 [video at 5:20-32].)

Detective Chupp also interviewed Nurse Buck. (PSOF ¶ 143.) Nurse Buck told Detective Chupp that Jacob got moved because of his behavior and because he engaged in lots of noise, yelling, moaning, and carrying on. (*Id.* ¶ 144.) She said when she later went to bring him his inhaler, Jacob was seated on the toilet, and when she knocked on the window to get his attention, he asked for toilet paper and did not seem out of breath or unable to breathe. (PSOF ¶ 146; Doc. 115 [video at 1:10-2:18].) Nurse Buck also recounted that Jacob had been throwing up over the past 3 days, and she said she placed

him on a liquid diet and had been giving him Gatorade and anti-nausea meds. (PSOF ¶¶ 154-55.) She recounted various commands she gave Jacob over that time, such as "Stand up. Stand against the wall. You need to breathe," and she described being "real gruff" because "they don't listen." (*Id.* ¶¶ 156-57.) She also recounted telling Jacob to stand against the wall to "let that stuff digest" and telling him to walk, and when instead of walking, Jacob took a drink of water and looked like he might throw up, she said "if you do that, you are going to clean it up." (*Id.* ¶¶ 158-59.) She said Jacob then took a walk and leaned over a trash can but did not throw up, and after that, he went back to his cell and laid down. (*Id.* ¶ 160.)

Regarding her last encounter with Jacob on March 13, 2021, Nurse Buck stated that when she checked on Jacob regarding his reported difficulty breathing, he was lying in bed; that she told him "you need to get up and walk out here"; and that as soon as Jacob walked over to the bench outside his cell, he "kind of slumped over," sat down, and began throwing up into a trash can "and didn't stop." (PSOF ¶¶ 147-48; Doc. 115 [video at 2:25-2:59].) She stated that she told Jacob he needed to breathe, and she was talking to him and cupping his back, telling him, "You need to breath, but you need to spit that out, spit it out." (PSOF ¶ 150; Doc. 115 [video at 3:00-3:13].) She stated that, during this time, she could hear some airflow, and she felt Jacob's side and could hear his heartbeat, but Jacob continued to throw up copious amounts from his mouth and nose, and his eyes sunk back in his head. (Doc. 115 [video at 3:18-3:20].) She stated that when a detention officer used a flashlight to check Jacob's pupils, Jacob's eyes were open but unmoving, so she called for an AED and the crash cart. (*Id.* at 3:20-4:01.) Then, within seconds, Jacob stopped breathing, and she could not get a heartbeat, so that's when those attending him laid him down on the floor and began emergency procedures. (PSOF ¶¶ 151-53; Doc. 115 [video at 3:10-4:15].)

**III.     Motion for Summary Judgment**

**1.     State-Law Claims**

In Count Four, Plaintiffs assert a state-law claim for medical negligence against Defendants. (Doc. 48 ¶¶ 57-70.) In Count Five, Plaintiffs assert a state-law claim for

wrongful death against Defendants that is predicated on Count Five.  (*Id.* ¶¶ 71-73.)[4]

Defendants contend they are entitled to summary judgment on Counts Four and Five because "Arizona substantive law," which applies here, requires a plaintiff asserting a medical malpractice claim "to produce qualified expert testimony establishing the applicable standard of care," yet neither of Plaintiffs' experts, Nurse Weissman and Dr. San Bartolome, possesses the qualifications necessary to satisfy Arizona's qualification requirement.  (Doc. 93 at 9-11.)  Defendants also contend they are entitled to summary judgment on Counts Four and Five because Arizona law requires expert testimony on causation, which is lacking here.  (*Id.*)

In their response, Plaintiffs make no effort to defend the sufficiency of their state-law claims and do not address whether their experts' qualifications satisfy Arizona law. To the contrary, Plaintiffs merely contend that "[e]xpert testimony is not required to prove a deliberate indifference claim" under 42 U.S.C. § 1983.  (Doc. 106 at 11.)  Additionally, in response to one of Defendants' expert-exclusion motions, Plaintiffs agree to "withdraw R.N. Debby Weissman . . .  as a 'testifying expert' in Plaintiffs' case-in-chief."  (Doc. 98 at 2, emphasis omitted.)

On this record, Defendants are entitled to summary judgment on Counts Four and Five.  Under Arizona law, one of the elements of a medical malpractice claim is that "[t]he health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances."  A.R.S. § 12-563.  This "standard of care normally must be established by expert medical testimony. . . .  [T]he requirement of expert testimony in a medical malpractice action is a substantive component of the common law governing this tort action, and . . . failure to produce such a witness results in judgment for the defendant."  *Sampson v. Surgery Center of Peoria, LLC*, 491 P.3d 1115, 1118 (Ariz. 2021) (cleaned up).  Moreover, A.R.S. § 12-2604 establishes

---

[4]   The complaint includes a third state-law claim—a claim for negligence against Yavapai County in Count Three.  (Doc. 48 ¶¶ 50-56.)  Because, as discussed, Yavapai County has now been dismissed, there is no need to address this claim.

specific qualifications for expert witnesses in medical malpractice cases, including that they must be licensed as a health care professional and, in the year preceding the event in question, have devoted a majority of their professional time to (1) the active clinical practice of the same health profession as the defendant; and/or (2) the instruction of students in the same health profession in an accredited program. Plaintiffs have made no effort to establish that Nurse Weissman (who, in any event, Plaintiffs have agreed to withdraw from their case-in-chief) or Dr. San Bartolome satisfy these requirements in relation to Nurse Buck.[5]

### 2. *Monell* Claim Against Wexford

In Count Two, Plaintiffs assert a § 1983 claim against Wexford pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (Doc. 48 ¶¶ 43-49.)

Defendants contend they are entitled to summary judgment on this claim for an array of reasons, including a lack of evidence. (Doc. 93 at 14-17.) In response, Plaintiffs concede they are "not contesting Defendant's MSJ regarding the *Monell* allegations." (Doc. 106 at 1.)

Accordingly, Wexford is entitled to summary judgment on Count Two. *Cf. Drake v. Living Spaces Furniture LLC*, 2024 WL 4444315, *11 (D. Ariz. 2024) ("[B]ecause Plaintiff is the party who bears the initial burden of establishing a prima facie case of disparate treatment, Defendant could permissibly seek summary judgment by pointing out the absence of evidence on that issue. Defendant made several such *Celotex* arguments here, so the burden shifted to Plaintiff to come forward with evidence from which a

---

[5] The Court acknowledges that in *Berk v. Choy*, 607 U.S. 187 (2026), the Supreme Court recently held that "Delaware's affidavit requirement," which functions as "a screening mechanism on malpractice suits, requiring plaintiffs to submit an affidavit from a medical professional attesting to the suit's merit," does not "appl[y] in federal court" because it "is at odds with Rule 8." *Id.* at 189-90, 194. However, Plaintiffs do not argue that *Berk* also forecloses the application Arizona's substantive law and expert qualification rules and the Court does not construe *Berk* as foreclosing their application at summary judgment or trial. *See, e.g., Mann v. United States*, 2012 WL 273690, *8 (D. Ariz. 2012) ("Arizona substantive law in medical negligent cases includes all the requirements found in the companion statutes, A.R.S. §§ 12-2603 and 12-2604."); *Wright v. United States*, 2008 WL 820557, *3-4 (D. Ariz. 2008) (concluding that the requirements of A.R.S. § 26-2604 were applicable because "[u]nder Fed. R. Civ. 601, federal courts apply state witness competency rules in both FTCA and diversity actions").

reasonable factfinder could find that he established a prima facie case of disparate treatment. However, Plaintiff failed to do so—as noted, his response brief does not seek to defend the sufficiency of any disparate treatment claim and instead focuses on his hostile work environment, retaliation, and punitive damage claims.") (cleaned up).

### 3. Fourteenth Amendment Claim against Nurse Buck

The only remaining claim is Count One, which is a § 1983 claim against Nurse Buck for deliberate indifference to serious medical needs, in violation of the Fourteenth Amendment. (Doc. 48 ¶¶ 35-42.)

"[P]retrial detainees . . . are entitled to adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Alvarez-Machain v. United States*, 107 F.3d 696, 701 (9th Cir. 1996) (cleaned up). The Ninth Circuit has held that "claims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (cleaned up). Under this standard, a plaintiff must show the following:

(1)   the defendant made an intentional decision with respect to the conditions under which the detainee was confined;

(2)   those conditions put the detainee at substantial risk of suffering serious harm;

(3)   the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved, making the consequences of the defendant's conduct obvious; and

(4)   by not taking such measures, the defendant caused the detainee's injuries.

*Id.* at 1125.

Following the submission of the parties' motion papers, the Court ordered Plaintiffs to address the sufficiency of their evidence regarding the fourth factor, *i.e.*, causation. (Doc. 121.) Plaintiffs provided a detailed response, which included a description of their experts' opinions on the issue of causation. (Doc. 122.) Thus, if the outcome at summary

judgment turned on the fourth element, it might be necessary to delve into the merits of Defendants' *Daubert* motions.

The Court concludes that such analysis is unnecessary here because Plaintiffs' evidence is insufficient to create a triable issue of fact "[w]ith respect to the third element" of their § 1983 claim against Nurse Buck, which is that "the defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case." *Gordon*, 888 F.3d at 1125 (cleaned up). "The mere lack of due care does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Id.* (cleaned up). Plaintiffs must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

Defendants have made an initial showing that Nurse Buck was not objectively deliberately indifferent to Jacob's right to receive reasonable medical care as it relates to detoxification. When Nurse Buck saw Jacob for the first time on March 11, 2021, she knew he was on detox observation, and, per protocol, she performed a COWS assessment. (Doc. 119 at 4.) At the time, Jacob's respiration of 16 breaths per minute was normal, and Jacob had a total COWS score of 4 based on an elevated resting pulse rate and nausea/loose stools. (*Id.*) That score indicated only "mild withdrawal." (*Id.*) In response to Jacob's symptoms, Nurse Buck instructed him to drink more water for his elevated heart rate, and she addressed his nausea by placing him on a liquid diet. (Doc. 110 at 25.) Over the next two days, Nurse Buck continued to follow standard detox protocols by performing regular COWS assessments—which continued to reflect only "mild withdrawal"—and charting Jacob's condition at least once per day.

To the extent Plaintiffs' theory is not only that Nurse Buck was deliberately indifferent to the risk of *death* but was also deliberately indifferent to the *pain and discomfort* Jacob experienced in the days leading up to his death,[6] Defendants have also

---

[6]    In their supplemental brief, Plaintiffs emphasize that "injury need not be limited to death alone" and contend that Nurse Buck "recognized the seriousness of [Jacob's] condition, but was indifferent to his serious needs, thus causing him additional harm." (Doc. 122 at 3-4.)

made an initial showing that Nurse Buck was not objectively deliberately indifferent. On March 12, 2021, when Jacob's nausea progressed to vomiting/diarrhea, Nurse Buck ordered antacid and Promethazine, which is administered before med pass for nausea control. (DSOF ¶ 10; Doc. 120 at 36-37; Doc. 120 at 114, Buck Dep. at 94:23-95:7.) And in the early morning of March 13, 2021, when Jacob still had vomiting/diarrhea, Nurse Buck directed him to get up and move around and to stand up against a wall after taking his meds to allow the liquid to digest so he would not throw up. Nurse Buck noted that Jacob drank a small amount of Gatorade and walked the hall without throwing up, and in a later chart note, she noted that he had not vomited again since early that morning and "will continue to monitor." (Doc. 110 at 25-26.) These facts do not show that Nurse Buck made any intentional decisions that subjected Jacob to a substantial risk of serious harm or failed to take "reasonable available measures" to abate any risks of serious harm based on her medical assessments and observations of Jacob's condition.

Defendants have also made an initial showing that Nurse Buck responded reasonably to Jacob's medical emergency when DO Klein alerted her that Jacob was having trouble breathing. Nurse Buck immediately got Jacob's inhaler and went to Jacob's cell. (DSOF ¶¶ 13-14; PSOF ¶ 57.) Although the distress call initially related to Jacob's difficulty breathing, as soon as Nurse Buck had Jacob come out of his cell and sit on a bench, Jacob began to violently throw up. (DSOF ¶ 15; PSOF ¶¶ 60-61.) Minutes later, when Jacob became unresponsive, Nurse Buck called for an AED and crash cart, and those attending to Jacob initiated CPR, applied AED shocks, and administered both nasal and intravenous Narcan until EMS arrived and took over resuscitation efforts. (DSOF ¶¶ 15-17.) These facts do not show that Nurse Buck made any intentional decisions that subjected Jacob to a substantial risk of serious harm or that, when confronted with the medical emergency, she failed to take reasonable available measures to abate that risk.

In their response, Plaintiffs identify various acts or failures to act by Nurse Buck in the days before Jacob's death that they identify as proof of deliberate indifference to Jacob's serious medical needs. (Doc. 106 at 8-13.) They first argue that the evidence

shows that Jacob's condition clearly deteriorated over the three days between March 11 and March 13, 2021 when Jacob was under Nurse Buck's care, and despite this obvious deterioration, Nurse Buck was "real gruff" with Jacob, told him to get up and move around, and threatened him with having to clean up his own vomit if he threw up. (*Id.*) Relatedly, they argue that even though Nurse Buck acknowledged during her deposition that all detox patients react differently when detoxing, she did not apply this principle to Jacob. (*Id.*) Instead, they contend that when Jacob did not follow her instructions to get up and move around and instead curled up on his cot in a fetal position, Nurse Buck merely dismissed his behavior as "typical with most detoxers." (*Id.*) Plaintiffs also argue that, despite Jacob's obvious weakened state, Nurse Buck did not contact Dr. Cattolico, call 9-1-1, or implement Wexford's emergency protocols that apply when an inmate is unable—as opposed to just unwilling—to get up and move around. (*Id.*) Last, Plaintiffs argue that Nurse Buck never reviewed Jacob's intake records, which they argue would have informed her Jacob that had asthma and prompted her to provide him a daily inhaler as opposed to the "rescue inhaler" he had been prescribed. (*Id.*)[7]

### a.    Jacob's Physical Decline

To show that Jacob's condition clearly deteriorated in the days before his death, Plaintiffs rely in part on the video-recorded statements of Jacob's cellmates to Detective Chupp during the investigation of Jacob's death. These statements include that Jacob was vomiting from the side of his bed, made strange sounds when he breathed, would throw up

---

[7]    In their supplemental brief, Plaintiffs reference Nurse Weissman's opinions and suggest that those opinions establish various "critical failures" in Nurse Buck's treatment of Jacob. (Doc. 122 at 2.) But putting aside the fact that the supplemental brief was only authorized to address fourth element (causation) of Plaintiffs' § 1983 claim against Nurse Buck (Doc. 121), and thus could not be used as a vehicle for advancing additional arguments concerning the third element (deliberate indifference) of that claim, Plaintiffs have conceded elsewhere that they are not relying on Nurse Weissman's opinions for purposes of their case-in-chief. (Doc. 98 at 2.) Thus, the analysis here is limited to the arguments set forth in Plaintiffs' response to the summary judgment motion. *Cf. Alsadi v. Intel Corp.*, 2019 WL 4849482, *13 (D. Ariz. 2019) ("[D]istrict courts are not required to consider rebuttal expert reports from a non-moving party at the summary judgment phase. Rule 56 motions are designed to test the sufficiency of the non-moving party's case-in-chief, and weed out cases which cannot be successfully presented at trial, . . . and the purpose of Rule 56 is best served by only considering evidence which the non-moving party could properly submit as part of its case-in-chief.") (cleaned up).

whenever he ate or drank, and was becoming more lethargic every day. (*See, e.g.*, PSOF ¶¶ 126, 129, 133, 134, 136-140.)

Even accepting that this evidence shows that Jacob was suffering from potentially serious detox symptoms, including frequent vomiting, diarrhea, and difficulty breathing, the observations of Jacob's cellmates do not create a triable issue of fact that Nurse Buck was objectively deliberately indifferent to any of these needs. First, as presented by Plaintiffs, the above statements by these cellmates are disjointed from each other and other facts in the record and provide mostly general impressions of Jacob's condition over a three-day period.[8] Plaintiffs also make no attempt to correlate these statements to Nurse Buck's own observations or her responses to Jacob at any given time.

More important, there is no evidence Jacob's cellmates alerted Nurse Buck to any serious concerns about Jacob's welfare (let alone that Nurse Buck failed to take reasonable available measures in response). Instead, the only time on the current record that someone notified Nurse Buck that Jacob had an immediate medical need was when DO Klein told her that Jacob was having trouble breathing, and Nurse Buck responded by immediately getting Jacob's inhaler and going to his cell to check on him.[9]

At bottom, Plaintiffs' argument seems to be that because Jacob's physical condition was obviously deteriorating, Nurse Buck should have appreciated the high degree of risk to Jacob and done more to address that risk. However, that argument is contradicted by

---

[8]   This is also true of select statements that Nurse Buck made at deposition or to Detective Chupp.

[9]   Although Jacob's cellmate Mr. Sanchez told Detective Chupp he heard Jacob tell "the nurse" that every time he wanted to breathe, it felt like he was being stabbed, Mr. Sanchez stated that this happened on March 13, 2021. (PSOF ¶ 142.) That is the same day that DO Klein reported Jacob was having trouble breathing and that Nurse Buck brought Jacob his inhaler. Even inferring that "the nurse" was Nurse Buck, absent any clarity about when this occurred or if it was a separate incident from when Nurse Buck had Jacob come out of his cell after DO Klein told her he was having difficulty breathing, Mr. Sanchez's statements are too vague to create a genuine issue of material fact that Nurse Buck was previously aware that Jacob was having trouble breathing and failed to respond reasonably to this issue.

the objective medical evidence known to and documented by Nurse Buck and other jail nursing staff at the time. The medical record evidence shows that, over a three-day period on opioid withdrawal observation, Jacob's COWS scores fluctuated between 4 and 10, as follows: March 10 (4, 8); March 11 (4, 10); March 12 (4, 8); March 13 (5). (Doc. 119 at 4.) According to the scoring scale on the COWS form, scores below 12 indicate only "mild" withdrawal symptoms, and Jacob's scores never met or exceeded that figure. (*Id.*)

R.N. Bruno also opined based on her review of these assessments that, apart from Jacob's first O2 saturation reading of 94%, which she characterized as "borderline," "[a]ll of [Jacob's] oxygen saturation levels were optimal." (Doc. 95-2 at 116.) This evidence appears to be undisputed. In a related vein, Jacob's respiration of 16 breaths per minute, which Nurse Buck characterized as normal, remained constant on every COWS assessment. (Doc. 120 at 105, Buck Dep. at 38:1-9; Doc. 119 at 4.)

Additionally, hours before Jacob's death on the morning of April 13, 2021, Jacob's O2 saturation was 98, his respiration was 16, and his total COWS score was 5, which was down from 8 the night before and down from 10 the previous day. (Doc. 119 at 4.) Defendants have proffered evidence that Jacob's vital signs, as documented by Nurse Buck that morning, "were grossly within normal limits, and his heart rate had improved from the previous day's scores," that these vitals "did not indicate that [Jacob] was in an emergent physical state," and that Jacob's later medical emergency represented "a sudden change in condition." (Doc. 95-2 at 116.)

Even when construed in the light most favorable to Plaintiffs, these facts do not demonstrate that Jacob's condition obviously deteriorated while Jacob was on detox observation or that Jacob had an obvious need for more or different medical care, such that a reasonable nurse in Nurse Buck's position would have apprehended that Jacob was at risk of sudden incapacitation and/or death absent additional medical care or intervention or was otherwise being caused to experience unnecessary pain and suffering. By the same token, these facts do not show that a reasonable nurse in Nurse Buck's position would have found it necessary at any time before Jacob's medical emergency on March 13, 2021 to

call 9-1-1, contact Dr. Cattolico, or initiate emergency medical procedures.

### b.  Vomiting/Not Getting Up

Plaintiffs contend that Jacob's vomiting and refusals to get up should have alerted Nurse Buck to a serious medical need, implying that it was objectively unreasonable for her to order Jacob to get up when she observed him curled up in a fetal position and vomiting into a garbage can next to his bed. (Doc. 106 at 8-9.) They argue that, in doing so, Nurse Buck failed to recognize that, as she stated at deposition, "all detoxers are different in terms of how they react to the detoxification process," and she failed to treat Jacob individually rather than simply characterizing his refusals to get up as typical detox behavior. (*Id.*)

The argument that Nurse Buck failed to treat Jacob individually because she evaluated his tendency to stay curled up in a fetal position based solely on what she understood to be typical detox behavior is an overgeneralization and ignores the undisputed evidence that Jacob also received individualized COWS assessments twice daily and that Nurse Buck regularly documented and relied on Jacob's vitals and presenting symptoms to assess what type of care he required. This includes that on March 11, 2021, she placed him on a full liquid diet due to his nausea, and on March 12, 2021, when his nausea had progressed to throwing up, she ordered anti-nausea medications.

Moreover, the evidence does not support that Jacob was physically unable to move or get out of bed as opposed to merely not wanting to do so while suffering the involuntary effects of detox. Nurse Buck's chart notes corresponding to Jacob's 6:30 a.m. COWS assessment on March 13, 2021 indicate that, despite his initial resistance to getting out of bed, Jacob was able to get up to have his vitals checked, and he was able to walk down the hall and drink a small amount of Gatorade. (Doc. 110 at 25.) Later that same morning, Jacob was again able to leave his cell before med pass to take Promethazine, which Nurse Buck ordered to alleviate his nausea, and although he later resisted coming out for med pass, he was once again able to walk out of his cell to take his meds, after which Nurse Buck told him to stand against a wall to let the fluid settle. (*Id.*) Also, after he apparently

kicked over his trash can, spilling 1/2 of a can of vomit and/or other fluid across the floor, Jacob was able to mop the floor at Nurse Buck's command, and he did not throw up while doing so. (*Id.*) Nurse Buck noted the plan was for the detention officer to walk him again "to get him up and moving," which she stated during deposition was medically necessary to prevent a patient form vomiting while on a liquid diet. (Doc. 120 at 112, Buck Dep. at 88:22-89:12.) Based on Nurse Buck's next chart entry, Jacob was subsequently moved to another cell due to his behavior, and Nurse Buck noted that he was sitting up on the toilet asking for toilet paper and not in any immediate distress. (Doc. 110 at 25-26; Doc. 115 [video at 1:10-2:18].)

A reasonable nurse observing these actions could have reasonably believed that Jacob's tendency/desire to stay in bed and not get up, even when he had to throw up, were typical detox behaviors and not indicative of an inability to get up or a serious medical need that was not already being addressed. Moreover, Nurse Buck testified during her deposition, and Plaintiffs do not materially dispute, that a patient on a liquid diet needs to get up and move around to prevent nausea and vomiting. (Doc. 120 at 112, Buck Dep. at 88:22-89:12.) Even if Nurse Buck was mistaken about the severity of Jacob's condition when she insisted he do these things, mistakes in clinical judgment at most show negligence or lack of due care, not reckless disregard, and mere negligence is not enough to establish a Fourteenth Amendment violation. *Gordon*, 888 F.3d at 1125.

### c. Gruffness

Nurse Buck's self-described "gruffness," while arguably insensitive and unprofessional, also does not rise to the level of a constitutional violation. *Acuna v. Ikegbu*, 2014 WL 7183702, *3 (N.D. Cal. 2014) (yelling at a patient may be rude but does not show deliberate indifference); *Mitchell v. Justus*, 2006 WL 1587459, *2 (W.D. Va. 2006) ("Mitchell alleges only that Justus has spoken to him a rude, vulgar, and/or obscene manner. While if true, Justus' choice of words may be unprofessional and inappropriate, alone they are insufficient to create a constitutional deprivation."). Instead, to prevail on their Fourteenth Amendment deliberate indifference claim, Plaintiffs must show that Nurse

Buck made intentional decisions about Jacob's medical care that placed Jacob at substantial risk of serious harm. *Gordon*, 888 F.3d at 1125. Absent this showing, mere rudeness or an unpleasant bedside manner, even though no cause for commendation, are not enough to create a triable issue of fact. *See also Dennison v. Prison Health Services*, 2002 WL 31026529, *7 (D. Me. 2002) ("Without a sufficiently serious deprivation of medical care there can be no constitutional violation; a bad attitude by a prison medical provider toward an inmate is not in and of itself actionable.").

### d.  Failure to Read Intake Form

Plaintiffs contend that Nurse Buck did not read Jacob's intake form and appear to argue that her failure to do so was objectively deliberately indifferent because, had she done so, she would have seen asthma listed as one of Jacob's medical conditions and would have asked a physician to get Jacob a "daily inhaler" instead of a rescue inhaler. (Doc. 106 at 9.) Plaintiffs rely on Nurse Buck's answer to a hypothetical question during her deposition whether, if she had known based on Jacob's intake form that Jacob suffered from asthma, there was "any specific action that you would take in terms of your duties and obligations to render treatment to him as his nurse." (Doc. 108 at 71, Buck Dep. at 151:4-8.) Nurse Buck answered, "If I was aware that an inmate had asthma or was having difficulty breathing and a rescue inhaler was not helping him, I would have a discussion with the physician to see if he could get a daily inhaler. That would be just part of what we do." (Doc. 108 at 71, Buck Dep. at 151:10-14.) She also testified that a person with "adult asthma" would be issued a different inhaler than a rescue inhaler. (Doc. 108 at 71, Buck Dep. at 151:15-20.)

These facts do not establish that Nurse Buck's purported failures to review Jacob's intake form or request that Dr. Cattolico prescribe Jacob a "daily inhaler" instead of a "rescue inhaler" was objectively deliberately indifferent to Jacob's serious medical needs or that these omissions placed Jacob at a substantial risk of serious harm of which a reasonable nurse in Nurse Buck's position would have known. Even assuming that Nurse Buck did not review Jacob's intake form, there is no evidence that jail nursing staff are

required to read patient intake forms or that the failure to do so renders Nurse Buck's subsequent conduct objectively unreasonable. Nurse Buck testified that "it is not the practice" for nurses to review intake forms for every patient; that they instead rely on the written or verbal reports of other nurses; and that when, as here, an inmate is on detox protocol, they review his COWS assessments. (Doc. 108 at 13-14, Buck Dep. at 33:19-34:23.) Moreover, as noted, all but Jacob's initial COWS assessment showed optimal O2 saturation levels, all of his COWS assessments showed normal respiration, and all of his COWS assessments indicated only "mild" withdrawal symptoms. (Doc. 119 at 4.) Additionally, the first known time Nurse Buck tried to bring Jacob his rescue inhaler on the morning of March 13, 2021, Jacob was seated on the toilet, and he answered her knock on the window by asking for toilet paper without showing any signs of difficulty breathing. (Doc. 115 [video at 1:10−2:18].) These facts would not have alerted a reasonable nurse in Nurse Buck's position that Jacob faced a substantial risk of serious harm unless prescribed a different inhaler.

Plaintiffs' argument also fails because Dr. Cattolico, not Nurse Buck, was responsible for prescribing Jacob's medications, including his inhaler. Although the evidence shows Nurse Buck could have contacted Dr. Cattolico to request additional orders for Jacob if she believed his initial prescriptions failed to adequately address his medical needs—as she did when she requested the addition of anti-nausea meds—there is no evidence Nurse Buck was aware of facts that would have prompted a reasonable nurse to request a different inhaler than the one Dr. Cattolico prescribed, such that her failure to do so demonstrates objective deliberate indifference.

Because no other claims remain, the Court will deny as moot Defendants' motions to exclude/strike Plaintiffs' expert and rebuttal reports.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 93), Motion to Exclude the Expert Opinions of

Debby Weissman, R.N. (Doc. 89), and Motion to Strike Improper Rebuttal Report of Mario San Bartolome, M.D. (Doc. 90).

(2)     Defendants' Motion for Summary Judgment (Doc. 93) is **granted**.

(3)     The remaining Motions (Docs. 89, 90) are **denied as moot**.

(4)     The Clerk of Court is directed to **dismiss** this action with prejudice and **enter judgment** accordingly.

Dated this 4th day of June, 2026.

_____
Dominic W. Lanza
United States District Judge